FILED
2013 Feb-07  PM 12:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ROBERT LEE CARR, JR., | ) | |
| as Administrator of the Estate of | ) | |
| REGINA THERESEA CARR, | ) | |
| Deceased. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:11-cv-02834-RBP |
| | ) | |
| MARSHALL COUNTY SHERIFF'S | ) | |
| OFFICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS SOUTHERN HEALTH PARTNERS, INC., CHRISTINE JENSEN, WILLIAM LUCIUS SMALL, KIM STOOPS, DR. TROY KILPATRICK AND JEFFREY REASONS

The defendants, Southern Health Partners, Inc, ("SHP"), Christine Jensen, William Lucius Small, Kim Stoops, Dr. Troy Kilpatrick and Jeffrey Reasons (hereinafter collective referred to as the "Medical Defendants"), submit the following brief in support of their motion for summary judgment.

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.   STATEMENT OF UNDISPUTED FACTS. . . . . . . . . . . . . . . . . . . . . . . . 4

  A.   Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  B.   Chronology of Medical Treatment. . . . . . . . . . . . . . . . . . . . . . 7

  C.   Medical Defendants met the standard of care and were not
       deliberately indifferent to any medical need of the plaintiff. . 11

  D.   Ms. Carr's cause of death was cardiomyopathy, and Ms.
       Carr had no history of heart problems. . . . . . . . . . . . . . . . . . 13

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  A.   THE MEDICAL DEFENDANTS ARE ENTITLED TO A
       SUMMARY JUDGMENT ON PLAINTIFF'S STATE
       LAW CLAIMS, BECAUSE THE PLAINTIFF HAS FAILED
       TO PRESENT THE REQUIRED EXPERT TESTIMONY. . 14

  B.   THE MEDICAL DEFENDANTS ARE ENTITLED TO
       SUMMARY JUDGMENT ON THE PLAINTIFF'S
       § 1983 CLAIM, BECAUSE THE PLAINTIFF CANNOT
       SHOW THAT THE MEDICAL DEFENDANTS
       PROXIMATELY CAUSED MS. CARR'S DEATH. . . . . . . 18

  C.   PLAINTIFF'S § 1983 CLAIMS AGAINST THE MEDICAL
       DEFENDANTS ARE DUE TO BE DISMISSED, BECAUSE
       THE PLAINTIFF HAS PRESENTED NO EVIDENCE
       THAT THE MEDICAL DEFENDANTS WERE
       DELIBERATELY INDIFFERENT TO A SERIOUS
       MEDICAL NEED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.      **STATEMENT OF UNDISPUTED FACTS**

A.      **Background**

1.      Christine Jensen ("Nurse Jensen") obtained her LPN degree from Gadsden State Community College in 1994, and has been licensed by the State of Alabama as an LPN since 1994.  (Ex. U, Jensen Aff. at ¶ 2.)

2.      From 2004 to 2005, Nurse Jensen was employed by Southern Health Partners, Inc. ("SHP") as an LPN at the Etowah County Jail.  (Ex. U, Jensen Aff. at ¶ 2.)

3.      From 2005 to 2006, Nurse Jensen was employed by Doctors Care as an LPN at the Etowah County Jail.  (Ex. U, Jensen Aff. at ¶ 2.)

4.      From 2006 to 2011, Nurse Jensen was employed by SHP as an LPN and worked for periods of time at the Talladega  County, Cherokee County and Marshall County Jails. (Ex. U, Jensen Aff. at ¶ 2.)

5.      Kim Stoops ("Nurse Stoops")  obtained her LPN degree from Gadsden State Community College in 2004, and she has been licensed by the State of Alabama as an LPN since 2004.  (Ex. W, Stoops Aff. at ¶ 2.)

6.      From December 2009 to the present, Nurse Stoops has been employed by SHP as an LPN at the Marshall County Jail.  (Ex. W, Stoops Aff. at ¶ 2.)

7.    William Lucius Small ("Nurse Small") obtained his LPN degree from Gadsden State Community College in 2007, and he obtained his RN degree from Gadsden State Community College in 2011.  (Ex. T, Small Aff. at ¶¶ 2-3.)

8.    From 2007 to 2011, Nurse Small was licensed by the State of Alabama as an LPN; from 2011 to the present, Nurse Small has been licensed as a RN by the State of Alabama.  (Ex. T, Small Aff. at ¶¶ 2-3.)

9.    From 2007 to 2011, Nurse Small was employed by SHP as an LPN at the Marshall County Jail; from August, 2010 to November, 2011, he was employed by SHP to be the Medical Team Administrator ("MTA") at the Marshall County Jail. (Ex. T, Small Aff. at ¶¶ 2-3.)

10.    Troy Kilpatrick, M.D. ("Dr. Kilpatrick") graduated from the University of Tennessee Medical School in 1958.  A true and correct copy of the curriculum vitae of Dr. Kilpatrick is attached to his affidavit as Exhibit 1.  (Ex. V, Kilpatrick Aff. at ¶ 2; Ex. V-1, Kilpatrick Aff.)

11.    Dr. Kilpatrick was contracted by SHP to be the medical director for the Marshall County Jail in February 2006, and he was medical director of the Marshall County Jail at the time of Regina Carr's incarceration from March 7, 2011 through March 15, 2011.  (Ex. V, Kilpatrick Aff. at ¶ 2.)

12.     During the entire time of Ms. Carr's incarceration in the Marshall County Jail, health care services have been provided to the inmates by SHP pursuant to a contract between SHP and the Marshall County Commission.  (Ex. T, Small Aff. at ¶ 4.)

13.     Health care in the jail is provided under the direction of a medical team administrator as well as a medical director; during the period complained of by the plaintiff in this action, the medical director in the jail was Dr. Troy Kilpatrick and William Lucius Small ("Nurse Small") was the medical team administrator.  (Ex. T, Small Aff. at ¶ 4.)

14.     When an inmate in the jail requires routine medical care, he or she obtains an inmate sick call slip from the corrections officer on duty in the housing unit and that form is provided to the medical staff for action; routine sick calls are conducted by the medical staff inside the housing unit.  (Ex. T, Small Aff. at ¶ 5.)

15.     Nurse Jensen, Nurse Small and Nurse Stoops are familiar with the standard of care required of an LPN treating a patient under the same or similar circumstances as those that existed with Regina Carr during her incarceration at the Marshall County Jail from March 7, 2011 through March 15, 2011.  (Ex. U, Jensen Aff. at ¶ 5; Ex. T, Small Aff. at ¶ 6; Ex. W, Stoops Aff. at ¶ 5.)

16.     Dr. Kilpatrick is familiar with the standard of care required of a jail physician treating a patient under the same or similar circumstances as those that existed with Regina Carr during her incarceration at the Marshall County Jail from March 7, 2011 through March 15, 2011.  (Ex. V, Kilpatrick Aff. at ¶ 5.)

### B.     Chronology of Medical Treatment

17.     A true and correct copy of Ms. Carr's jail medical chart is attached as Exhibit 1 to the affidavit of Nurse Stoops.  (Ex. W, Stoops Aff. at ¶ 6; Ex. W-1, Stoops Aff.)

18.     Regina Carr was booked into the Marshall County Jail on March 7, 2011.  (Ex. T, Small Aff. at ¶ 8.)

19.     On March 8, 2011, Nurse Stoops completed an intake screening of Ms. Carr, listing her medications, the pharmacy where she filled her prescriptions and the health care providers who were currently treating her.  (Ex. W, Stoops Aff. at ¶ 8.)

20.      Nurse Stoops then sought to obtain records from these providers. (Ex. W, Stoops Aff. at ¶ 8.)

21.     On March 9, 2011, upon obtaining records from Latham Pharmacy and Marshall Medical Center North, Nurse Stoops notified Dr. Kilpatrick of the medications identified in the records received from Latham's Pharmacy, which

included the psychotropic medications Lithium, Alprazolam, Risperidone, Seroquel, Venlafaxine and Bupropion.  (Ex. W, Stoops Aff. at ¶ 9.)

    22.    Dr. Kilpatrick then verbally ordered Haldol  5 mg. by mouth twice a day and Cogentin 2 mg. by mouth twice a day.  (Ex. W, Stoops Aff. at ¶ 9.)

    23.    Nurse Stoops also noted telephone orders from Dr. Kilpatrick to continue Synthroid 50 mcg by mouth every morning and Haldol 5 mg/ml intramuscularly if needed for self harming behavior.  (Ex. W, Stoops Aff. at ¶ 9.)

    24.    Nurse Stoops also noted that she would continue to observe Ms. Carr.  (Ex. W, Stoops Aff. at ¶ 9.)

    25.    On March 12, 2011, at 1:30 p.m., after being informed by a corrections officer that Ms. Carr was exhibiting bizarre behavior, Nurse Small assessed Ms. Carr, taking her vital signs and noting that the patient showed no signs of sweating or vomiting.  (Ex. T, Small Aff. at ¶ 11.)

    26.    Nurse Small then contacted Dr. Kilpatrick, who verbally ordered Haldol 1 cc intramuscularly and instructed Nurse Small to continue by mouth medications. (Ex. T, Small Aff. at ¶ 11.)

    27.    Nurse Small complied with these orders, and noted that the inmate tolerated the injection of Haldol well.  (Ex. T, Small Aff. at ¶ 11.)

28.     At 3:45 p.m., Nurse Small followed up with Ms. Carr, noting that she was standing at the door with no signs of distress.  (Ex. T, Small Aff. at ¶ 11.)

29.     On March 13, 2011 at 11:00 a.m., Nurse Jensen contacted Dr. Kilpatrick regarding the inmate's behavior, which included picking at paint on the floor, picking at non-existent items in the sink, not eating anything, drinking two glasses of water, and that the inmate was up all night either sitting in floor or on bunk or standing in door.  (Ex. U, Jensen Aff. at ¶ 11.)

30.     Dr. Kilpatrick then entered a verbal order for Thorazine 25 mg by mouth now and at the evening pill call.  (Ex. U, Jensen Aff. at ¶ 11.)

31.     At 12:30 p.m. on March 13, 2011, Nurse Jensen took Ms. Carr's vital signs, which were a blood pressure of 140/92, pulse of 117, oxygen saturation rate of 87 and respirations of 24.  (Ex. U, Jensen Aff. at ¶ 11.)

32.     Nurse Jensen then notified Dr. Kilpatrick of Ms. Carr's status.  (Ex. U, Jensen Aff. at ¶ 11.)

33.     On March 14, 2011 at 8:00 a.m., Nurse Small reviewed Ms. Carr's medications with Dr. Kilpatrick by telephone, and Dr. Kilpatrick discontinued the Haldol and Cogentin by mouth medication.  (Ex. T, Small Aff. at ¶ 13.)

34.     Dr. Kilpatrick ordered that the inmate be started on Thorazine 50 mg by mouth twice a day.  (Ex. T, Small Aff. at ¶ 13.)

35.     Nurse Small took the inmate's vital signs, which were a blood pressure of 150/94, respirations of 18, pulse of 99, oxygen saturation rate of 98 and temperature of 97.8 degrees, and Nurse Small also noted that he heard a wheeze in Ms. Carr's right lower lobe.  (Ex. T, Small Aff. at ¶ 13.)

36.     At 10:00 a.m. on March 14, 2011, Nurse Small noted that the inmate's file was placed for Dr. Kilpatrick to review and for Ms. Carr to be seen by Dr. Kilpatrick on March 15, 2011 during his next visit to the jail due to her behavioral issues.  (Ex. T, Small Aff. at ¶ 13.)

37.     Nurse Small also noted that a chest x-ray would be ordered for the inmate's wheezing in right lower lobe.  (Ex. T, Small Aff. at ¶ 13.)

38.     Finally, Nurse Small instructed the inmate to consume more fluids, and noted that the inmate voiced her understanding.  (Ex. T, Small Aff. at ¶ 13.)

39.     On March 15, 2011, Nurse Small and Nurse Jensen responded to the notification that Ms. Carr had fallen and was not moving in her cell.  (Ex. T, Small Aff. at ¶ 14.)

40.     Nurse Small and Nurse Jensen conducted CPR and EMT's were notified and responded to the scene.  (Ex. T, Small Aff. at ¶ 14.)

41.     During her incarceration, Ms. Carr had an albuterol sulfate inhaler that she was to use as needed and that was "KOB," meaning "kept on block."  (Ex. W, Stoops Aff. at ¶ 14.)

42.     In the jail, patients with inhalers were allowed to keep their inhalers on the block so that they could request them from the corrections officers on duty if they need them.  (Ex. W, Stoops Aff. at ¶ 14.)

**C.     Medical Defendants met the standard of care and were not deliberately indifferent to any medical need of the plaintiff.**

43.     In the opinion of Nurse Stoops, Nurse Small and Nurse Jensen, these nurses were all appropriately qualified as LPN's to provide nursing care to Ms. Carr. (Ex. U, Jensen Aff. at ¶ 15; Ex. T, Small Aff. at ¶ 16; Ex. W, Stoops Aff. at ¶ 15.)

44.     Based upon their education, experience and training, as well as their review of Ms. Carr's jail medical chart and their treatment of Ms. Carr, it is the opinion of Nurse Stoops, Nurse Jensen and Nurse Small that all treatment provided to Ms. Carr by Nurse Stoops, Nurse Jensen and Nurse Small was appropriate and met the standard of care.  (Ex. U, Jensen Aff. at ¶ 16; Ex. T, Small Aff. at ¶17; Ex. W, Stoops Aff. at ¶ 16.)

45.     It is a common and acceptable practice in the jail setting for a physician to provide treatment to a patient by telephone after a nurse communicates the patient's symptoms and assesses the patient.  (Ex. V, Kilpatrick Aff. at ¶ 15.)

46.    In Dr. Kilpatrick's opinion, it is appropriate for a jail physician to order medications by telephone to treat a patient's conditions or symptoms without physically observing or physically assessing the patient.  (Ex. V, Kilpatrick Aff. at ¶ 15.)

47.    In Dr. Kilpatrick's opinion, the treatment he provided by telephone to Ms. Carr was acceptable, appropriate and within the standard of care.  (Ex. V, Kilpatrick Aff. at ¶ 15.)

48.    In Dr. Kilpatrick's opinion, none of Ms. Carr's symptoms prior to her sudden arrhythmia on March 15, 2011 necessitated an in person assessment or examination by him, an order to send Ms. Carr to the emergency room or an order for a consult to a psychiatrist or mental health professional.  (Ex. V, Kilpatrick Aff. at ¶ 15.)

49.    In Dr. Kilpatrick's opinion, the medications that he ordered to treat Ms. Carr were acceptable, appropriate and within the standard of care.  (Ex. V, Kilpatrick Aff. at ¶ 16.)

50.    In Dr. Kilpatrick's opinion, it was within the standard of care to take Ms. Carr off the psychotropic medications shown on the Latham's Pharmacy printout and order Haldol and Thorazine, which were similar to the medications on the printout and appropriate to treat Ms. Carr's condition.  (Ex. V, Kilpatrick Aff. at ¶ 16.)

51.     Based upon his education, experience and training, as well as his review of Ms. Carr's jail medical chart and treatment of Ms. Carr, it is Dr. Kilpatrick's opinion that all treatment provided to Ms. Carr by him was appropriate and met the standard of care.  (Ex. V, Kilpatrick Aff. at ¶ 17.)

52.     It is Dr. Kilpatrick's opinion that no act or failure to act by him or the nursing staff proximately caused Ms. Carr's death.  (Ex. V, Kilpatrick Aff. at ¶ 17.)

53.     On no occasion was Ms. Carr ever denied medical care nor was Dr. Kilpatrick, Nurse Stoops, Nurse Small, Nurse Jensen or any member of the nursing staff ever indifferent to any of Ms. Carr's medical needs. (Ex. V, Kilpatrick Aff. at ¶ 17.); Ex. U, Jensen Aff. at ¶ 16; Ex. T, Small Aff. at ¶17; Ex. W, Stoops Aff. at ¶ 16.)

## D.     Ms. Carr's cause of death was cardiomyopathy, and Ms. Carr had no history of heart problems.

54.     The final autopsy report reveals that Ms. Carr's death was caused due to cardiomyopathy.  (Ex. S, Final Autopsy Report.)

55.     According to Braxton Smith, M.D., Ms. Carr's physician since the 1970's, Ms. Carr did not have any diagnosis for heart related problems prior to her death.  (Ex. Q, ABI Report Pgs 25-26.)

56.     According to Rashida Abbas, M.D., a heart doctor who treated Ms. Carr while she was at Huntsville Hospital, the only previous heart related conditions were

in 2003 for chest pains and 2006 for a rapid heart rate.  All tests in 2003 appeared normal and the 2006 incident only resulted in a single follow-up visit.  Although Ms. Carr's family informed the hospital that Ms. Carr suffered from Chronic Obstructive Pulmonary Disease, there was no medical documentation to confirm that such a diagnosis of COPD exists.  (Ex. Q, ABI Report, Pg 27.)

## II.   ARGUMENT

### A.   THE MEDICAL DEFENDANTS ARE ENTITLED TO A SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS, BECAUSE THE PLAINTIFF HAS FAILED TO PRESENT THE REQUIRED EXPERT TESTIMONY .

The plaintiff's state law wrongful death (Count II) and medical malpractice (Count V) claims against the Medical Defendants are governed by the Alabama Medical Liability Act, *Ala. Code*, § 6-5-480, *et seq*. (1975), as supplemented by the Alabama Medical Liability Act of 1987, *Ala. Code*, § 6–540, *et seq*. (1975).  The Medical Liability Act governs "any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." *Ala. Code* § 6-5-551 (1975).  This includes the plaintiff's claims against Defendant Jeff Reasons for negligent supervision (Count VI.)  *See, e.g., Ex parte Ridgeview Health Care Center, Inc.*, 786 So.2d 1112, 1116 (Ala. 2000) ("[T]he [2000 amendment] to § 6-5-551 makes it clear that a claim against a health-care provider

14

alleging that it breached the standard of care in hiring, training, supervising, retaining, or terminating its employees is governed by the Alabama Medical Liability Act.").

The Medical Liability Act states that "the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." *Ala. Code* § 6-5-548(a) (1975). To meet this burden of proof, the plaintiff was required to present the testimony of a qualified medical expert to establish the applicable standard of care, a breach of the standard of care, and proximate cause. *See, e.g., East Alabama Behavioral Medicine, P.C. v. Chancey*, 883 So.2d 162, 172 (Ala. 2003); *Ala. Code* § 6-5-548 (1975).

Since the plaintiff would have the burden of proving at trial that the standard of care was breached and that such breach proximately caused Ms. Carr's death, the Medical Defendants are required only to "point out" that there is an absence of evidence to satisfy this burden of proof. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); *Danskine v. Miami Dade Fire Department*, 253 F.3d 1288, 1293 (11th Cir. 2001). The Medical Defendants nonetheless have supported their motion for summary judgment with the affidavits of Nurse Jensen, Nurse Small, Nurse Stoops and Dr. Kilpatrick, all of

whom have testified that they met the standard of care in their treatment of Ms. Carr. (Ex. U, Jensen Aff. at ¶ 16; Ex. T, Small Aff. at ¶17; Ex. W, Stoops Aff. at ¶ 16; Ex. V, Kilpatrick Aff. at ¶ 17.)  Moreover, Dr. Kilpatrick has testified that "no act or failure to act by [him] or the nursing staff proximately caused Ms. Carr's death." (Ex. V, Kilpatrick Aff. at ¶ 17.)

In this case, the deadline for expert disclosures has expired.  Because the plaintiff has failed to present the testimony of a qualified medical expert to support his claims, the Medical Defendants are entitled to a summary judgment.  *See, e.g., Sherrer v. Embry*, 963 So.2d 79, 83 (Ala. 2007); *Thomas v. Baptist Medical Center-DeKalb*, 614 So.2d 997, 999 (Ala. 1993).

Of course, since SHP's employees, Nurse Jensen, Nurse Small and Nurse Stoops, are entitled to a summary judgment, SHP also is entitled to a summary judgment on any claim for respondeat superior against it.  *See, e.g., Nissan Motor Acceptance Corp. v. Jackson*, 738 So.2d 812, 814 (Ala. 1999) ("NMAC's liability is predicated solely on Rivers' liability.  If Rivers is found not to be at fault, then NMAC cannot be at fault."); *Dick v. Springhill Hospitals, Inc.*, 551 So.2d 1034, 1038 (Ala. 1989) ("Mrs. Dick argues that Springhill is vicariously liable for Dr. Ennis's negligence.  Inasmuch as we are affirming the summary judgment entered in favor of Dr. Ennis, Springhill can have no vicarious liability."); *United Steel Workers of*

*America AFL-CIO-CLC v. O'Neal*, 437 So.2d 101, 103 (Ala. 1983) ("In a joint action in tort for misfeasance or malfeasance against an agent and his principal, where *respondeat superior* is the sole basis of recovery, a verdict in favor of the agent works an automatic acquittal of the principal. . . .").

Finally, Defendant Jeff Reasons also is entitled to a summary judgment on the plaintiff's claims for negligent supervision. As noted above, the Medical Liability Act's expert testimony requirement applies to these claims, and the plaintiff failed to satisfy that requirement by presenting expert testimony establishing that Jeff Reasons breached the standard of care in supervising SHP's nurse employees or its contracted physician. Although Jeff Reasons is entitled to a summary judgment on this claim for that reason alone, the plaintiff also could not recover on this claim because there is no underlying tort, *i.e.*, no medical malpractice committed by Nurse Jensen, Nurse Small, Nurse Stoops or Dr. Kilpatrick *See, e.g., Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 824 (Ala. 1999) (noting that negligent supervision would have to be proven "*in addition to proving the underlying tortious conduct of an offending employee*") (emphasis in original); *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F.Supp.2d 1314, 1320 (N.D. Ala. 2002) ("In order to establish a claim against an employer for negligent supervision, training and/or retention, the plaintiff must

establish that the allegedly incompetent employee committed a common-law, Alabama tort.").

**B.    THE MEDICAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S § 1983 CLAIM, BECAUSE THE PLAINTIFF CANNOT SHOW THAT THE MEDICAL DEFENDANTS PROXIMATELY CAUSED MS. CARR'S DEATH.**

The plaintiff's § 1983 claim (Count I) against the Medical Defendants requires the plaintiff to prove that the Medical Defendants' actions proximately caused Ms. Carr's death.  See *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009) (stating "Plaintiffs must show . . . causation between that [deliberate] indifference and the plaintiff's injury); *Wingster v. Head*, 318 F. App'x 809, 815 (11th Cir. 2009) (stating "[a] § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation").

The plaintiff's cannot show that the Medical Defendants' actions contributed in any manner to Ms. Carr's death.  The cause of Ms. Carr's death was cardiomyopathy, which is a complex medical matter requiring expert testimony on causation.  Medical expert testimony is essential to prove causation where it involves a matter that "is not a natural inference that a juror could make through human experience. *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 715 (11th Cir. 2008) (stating "medical expert testimony is essential to prove causation" regarding whether TASER caused compression fractures in an individual's spine).  "In order to survive summary

judgment, the [plaintiff] must have presented a competent expert who could testify

'to a reasonable degree of medical certainty' that the TASER caused his injuries."

*Wilson*, 303 F. App'x at 715.

In this case, the undisputed medical expert testimony is that "no act or failure to

act by [Dr. Kilpatrick] or the nursing staff proximately caused Ms. Carr's death."

(Ex. V, Kilpatrick Aff. at ¶ 17.)  As the deadline for expert disclosures has expired,

the plaintiff cannot produce an expert to contradict the undisputed opinion of Dr.

Kilpatrick.  The plaintiff, therefore, cannot meet his burden of showing a causal

relationship between the Medical Defendants' acts and Ms. Carr's death from

cardiomyopathy.  Accordingly, summary judgment should be awarded.

### C.   PLAINTIFF'S § 1983 CLAIMS AGAINST THE MEDICAL DEFENDANTS ARE DUE TO BE DISMISSED, BECAUSE THE PLAINTIFF HAS PRESENTED NO EVIDENCE THAT THE MEDICAL DEFENDANTS WERE DELIBERATELY INDIFFERENT TO A SERIOUS MEDICAL NEED.

In order to prevail under 42 U.S.C. § 1983 on his claims against the Medical

Defendants, the plaintiff must demonstrate that the Medical Defendants were

deliberately indifferent to a serious medical condition.  Because society does not

expect that prisoners will have unqualified access to health care, deliberate

indifference to medical needs amounts to an Eighth Amendment violation only if

those needs are "serious."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  "A serious

19

medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Kelley v. Hicks*, 400 F. 3d 1282, 1284 n. 3 (11th Cir. 2005).

Where a prisoner has received medical attention and the dispute concerns the adequacy of the medical treatment, deliberate indifference is not shown. *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985). Indeed, in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, (1976), the United States Supreme Court held that medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Thus, the inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute an unnecessary and wanton infliction of pain." (*Id.* at 105-06.) Instead, it must be shown that there was a "deliberate indifference" to the serious medical needs of a prisoner. (*Id.* at 104.)

In addition, an inmate does not have a right to a *specific* kind of medical treatment. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 246 (1983) (holding, "the injured detainee's constitutional right is to receive the needed medical treatment; *how [a municipality] obtains such treatment is not a federal constitutional question*") (emphasis added). Furthermore, this Court should not substitute its medically untrained judgment for the professional judgment of the medical health professionals who treated the plaintiff. See *Waldrop v. Evans*, 871 F.2d 1030, 1035

(11th Cir. 1989) (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (stating that the evidence showed the plaintiff received "significant" medical care while in jail, and although the plaintiff may have desired different modes of treatment, care provided by the jail did not constitute deliberate indifference), cert. denied, 475 U.S. 1096 (1986); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (stating "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments.").

In this case, there is absolutely no evidence from which a jury could find that the Medical Defendants acted with deliberate indifference to any serious medical need of Ms. Carr.   Indeed, the plaintiff's medical chart and the testimony of Nurse Jensen, Nurse Stoops, Nurse Small and Dr. Kilpatrick demonstrates that Ms. Carr received much treatment during her incarceration from March 7, 2011 through March 15, 2011.  Ms. Carr was screened by the nursing staff on March 8, 2011 and received daily treatment by the nurses and Dr. Kilpatrick from March 12 through March 15, 2011.   (See Ex. W, Stoops  Aff. at ¶¶ 9-13.)   Additionally, Ms. Carr received medication to address her psychotropic condition from March 9 through March 15, 2011.  (Ex. O, Medication Administration Record).  Finally, Nurse Jensen, Nurse

Small, Nurse Stoops and Dr. Kilpatrick have all testified that they met the standard of care in their treatment of Ms. Carr, and the plaintiff has produced no expert testimony to contradict these opinions. (Jensen Aff. at ¶ 16; Small Aff. at ¶17; Stoops Aff. at ¶ 16; Kilpatrick Aff. at ¶ 17.)   As such, the Medical Defendants are entitled to judgment as a matter of law.

III.   **CONCLUSION**

For the aforementioned reasons, this Court should grant the Medical Defendants' motion for summary judgment.

Respectfully submitted,

s/Robert N. Bailey, II
Daniel F. Beasley
Robert N. Bailey, II
Attorneys for the Defendants
Southern Health Partners, Inc., Christine
Jensen, William Lucius Small, Kim Stoops,
Dr. Troy Kilpatrick and Jeffrey Reasons

Of Counsel:
LANIER FORD SHAVER & PAYNE P.C.
2101 West Clinton Avenue, Suite 102
P. O. Box 2087
Huntsville, Alabama  35804
(256) 535-1100
Fax:  (256) 533-9322
dfb@lanierford.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Martin Weinberg
MARTIN WEINBERG, P.C.
P. O. Box 154
Shannon, AL  35142

Abbey Herrin
2170 Highland Avenue South,  Suite 104
Birmingham, AL 35205

E. Allen Dodd, Jr.
J. Eric Brisendine
Scruggs, Dodd and Brisendine
Post Office Box 681109
Fort Payne, Alabama  35968

Fred Lee Clements, Jr.
Kendrick E. Webb
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive
P. O. Box 240909
Montgomery, AL  36124

s/Robert N. Bailey, II
Of Counsel

23