IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **ROBERT LEE CARR, JR.,** ) | |
| as Administrator of the Estate of ) | |
| **REGINA THERESEA CARR, Deceased** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No: 4:11-CV-02834-RBP |
| ) | |
| **MARSHALL COUNTY SHERIFF'S** ) | |
| **OFFICE; SCOTT WALLS, individually** ) | |
| **and as Sheriff of Marshall County, Alabama;** ) | |
| **DEWAYNE BANKSON, individually and in** ) | |
| **his official capacity as Warden for Marshall** ) | |
| **County Jail; SOUTHERN HEALTH** ) | |
| **PARTNERS, INC.; JEFFREY REASONS;** ) | |
| **JOSH KIRKLAND; DR. TONY FRANK** ) | |
| **KILPATRICK; KIM STOOPS; CHRISTINE** ) | |
| **JENSEN and WILLIAM LUCIUS SMALL** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This cause comes before the court on Defendants' Motions for Summary Judgment (Docs. 94, 97). Defendants Scott Walls, Dewayne Bankson, and Joshua Kirkland (hereinafter the County defendants) filed a Motion for Summary Judgment (doc. 94) on February 7, 2013. A separate Motion for Summary Judgment (doc. 97) was filed on February 7, 2013 by defendants Southern Health Partners (SHP), Christine Jensen, William Lucius Small, Kim Stoops, Dr. Troy Kilpatrick, and Jeffrey Reasons (hereinafter the Medical defendants). The plaintiff responded to the motions in a sealed response (doc. 104), to which the defendants replied (docs. 105, 106).

**Facts**[1]

---

[1] Pursuant to the standard for summary judgment motions, the court construes all evidence in the light most favorable to the non-moving party, here the plaintiff. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Regina Carr was arrested on March 7, 2011 and charged with unlawful manufacturing of a controlled substance and unlawful possession of a precursor chemical. Ala. Code § 13A-12-217; § 20-2-190. She was detained prior to her trial in the Marshall County Jail with bond set at $5,000. Officer Joshua Kirkland serves as the booking officer at the jail and processed Ms. Carr. During booking, Kirkland completed a booking report, medical observations form, medical questionnaire, and suicide risk form. (Doc. 95, Ex. K). Ms. Carr reported to Kirkland that she was taking Albuterol[2] and "Finnegan"[3]. Ms. Carr also reported to receiving treatment for depression and bipolar disorder as well as having previously attempted suicide. Ms. Carr reported to Kirkland that she was not suicidal at the time of booking. Ms. Carr's booking forms were placed in a file for review by SHP's medical personnel. Following booking, Ms. Carr was placed in the jail's separate corridor for female prisoners and had no further contact with Kirkland. Because Ms. Carr had reported to being previously suicidal, she was placed on suicide watch in a cell located directly across from the correction officers' station. Suicide watch involves cell block checks every thirty minutes.

Nurse Kim Stoops, LPN and SHP employee, examined Ms. Carr on March 8, 2011, and completed the required intake screening. Ms. Carr notified Nurse Stoops of her current prescriptions and health care providers. Stoops was able to obtain these records for verification

---

[2] Kirkland also wrote "short of breath" on the form. He testifies this was written to indicate the reason why Ms. Carr took Albuterol and was not indicating a current complaint or condition. While this fact could be in dispute, it is not material since Ms. Carr was provided with medical care subsequent to the booking regardless of whether she was actually short of breath.

[3] Without any expert evidence or information otherwise, the court will assume "Finnegan" refers to the commonly known "Phenergan." Although Ms. Carr provided reasoning for taking Albuterol, no reason for taking the Phenergan was provided.

on March 9, 2011. Stoops notified the SHP staff physician for the Marshall County Jail, Dr. Troy Kilpatrick, by phone, that Ms. Carr's prescriptions included the psychotropic medications Lithium, Alprozolam, Risperidone, Seroquel, Venlafaxine, and Bupropion. Dr. Kilpatrick verbally ordered Stoops to administer Haldol, Cogentin, and Synthroid daily to Ms. Carr, as well as extra Haldol "if needed for self-harming behavior." (Doc. 99, Ex. W, Stoops Aff. at ¶ 9). Ms. Carr received the medication as prescribed by Dr. Kilpatrick from a SHP nurse and had her vital signs checked daily by a SHP nurse. Ms. Carr's Albuterol was kept in the female jail corridor and was available for use upon Ms. Carr's request.

The female corrections officers noted that Ms. Carr was pacing in her cell and was not sleeping at night. They also noted she would sit backwards on the toilet in the cell and sleep with her head on the sink. Though she was encouraged to sleep in her bunk, she would not comply. On March 12, when the officers caught Ms. Carr eating toilet paper, they notified the SHP nurse on duty, William Lucius Small, LPN, who took Ms. Carr's vital signs and contacted Dr. Kilpatrick by phone. Dr. Kilpatrick ordered an extra injection of Haldol. Nurse Small noted that Ms. Carr responded well to the Haldol and was not exhibiting any signs of distress that same afternoon. On March 13, 2011, Nurse Christine Jensen, LPN, observed Ms. Carr exhibiting further strange behavior, including picking at paint, refusing to eat, and refusing to sleep. Dr. Kilpatrick was notified by phone and verbally ordered Thorazine. Nurse Small took Ms. Carr's vital signs at 12:30 PM on March 13, after administering the Thorazine, and noted a blood pressure of 140/92, oxygen saturation of 87, and respirations at 24. Nurse Small notified Dr. Kilpatrick of Ms. Carr's status.

On March 14, 2011, the corrections officers reported Ms. Carr as exhibiting strange

behavior, possibly hallucinating and speaking to herself within her cell. The SHP nurse on duty was notified. Nurse Small contacted Dr. Kilpatrick and reviewed Ms. Carr's status. Dr. Kilpatrick discontinued the prescribed Haldol and Cogentin, ordering Thorazine to be given regularly instead. Ms. Carr's vital signs were taken and reported to be: blood pressure of 150/94, respirations of 18, pulse of 99, oxygen saturation of 98, and temperature of 97.8 degrees. Nurse Small noted hearing a wheezing sound in Ms. Carr's lower right lung. Nurse Small placed Ms. Carr's file for Dr. Kilpatrick's review. Ms. Carr was scheduled to be seen by Dr. Kilpatrick the following day, on March 15, 2011, and was also scheduled to receive a chest x-ray to investigate the wheezing in her lung. In the evening on March 14, Ms. Carr requested and was provided use of her Albuterol inhaler.

On March 15, 2011, Ms. Carr responded affirmatively to the 6:00 AM roll call check. At approximately 7:30 AM, the female officer at the station heard a loud thump from Ms. Carr's cell and saw Ms. Carr had collapsed in her cell. The officer immediately called for the SHP nurse on duty. Two nurses arrived within seconds and began CPR. Paramedics were called and arrived at 7:36 AM. Ms. Carr was transported to Marshall Medical Center at approximately 7:45 AM. She was later transferred to Huntsville Hospital. Ms. Carr never recovered. On March 17, 2011, her family, upon medical advice, decided to discontinue life support. The autopsy performed on Ms. Carr concluded the official cause of death to be cardiomyopathy.

The plaintiff, father of the deceased Ms. Carr, filed the current case on August 21, 2011. The complaint was first amended on October 20, 2011. (Doc. 31). The second amended complaint was filed on January 5, 2012. (Doc. 57). The court allowed the plaintiff to file the current complaint, the third amended complaint, on March 12, 2012. The County Defendants,

including Marshall County Sheriff's Office, filed a Motion for Partial Dismissal (doc. 73) on March 27, 2012 which was granted without objection. Pursuant to the motion's requests, the Marshall County Sheriff's Office and all unnamed jail staff were dismissed as defendants. The remaining defendants then filed their motions for summary judgment which bring this matter before the court.

## Summary Judgment Legal Standard

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the

non-moving party's favor). "On summary judgment, "[i]f there is conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor." *Shotz v. City of Plantation, Fla.*, 344 F. 3d 1161, 1164 (11th Cir. 2003) (quoting *Molina v. Merritt & Furman Ins. Agency*, 207 F. 3d 1351, 1356 (11th Cir. 2000)). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## Legal Analysis

The plaintiff has alleged that all defendants exercised deliberate indifference to Ms. Carr's serious medical needs, thus violating her constitutional rights. The plaintiff seeks redress according to 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

The plaintiff, as administrator of Ms. Carr's estate, is asserting this action on behalf of the deceased. Normally, Alabama's survivorship law, Alabama Code § 6-5-462, dictates that any

action for personal injury that has not been filed before the injured dies does not survive in favor of the personal representative. *See Bates v. L&N Emp. Credit Union*, 374 So. 2d 323, 324 (Ala. 1979). In *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, the Eleventh Circuit found that an unfiled § 1983 action that did not allege action resulting in death would not survive the death of the decedent. 639 F.3d 1041, 1047 (11th Cir. 2011). However, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala. Code. § 6-5-410." *Id* (citing *City of Tarrant, Ala. v. Jefferson,* 682 So. 2d 29, 29-31 (Ala. 1996); *Brown v. Morgan County, Ala*., 518 F.Supp. 661, 665 (N.D. Ala. 1981)). In these cases, the plaintiff "must prove as part of her case that the defendants' actions were the actual and proximate cause of the injuries alleged." *Gilliam ex rel. Waldroup v. City of Prattville*, 667 F. Supp. 2d 1276, 1299 (M.D. Ala. 2009) (overturned on other grounds; citing *DiBiasi v. Joe Wheeler Elec. Membership Corp*., 988 So. 2d 454, 460 (Ala. 2008)).  Thus, the first question that this court must address is one of proximate cause, determining whether a sufficient connection has been drawn between the alleged constitutional violation and Ms. Carr's death.

      Both the plaintiff and the defendants agree that Ms. Carr's autopsy established cardiomyopathy, a heart condition, to be the official cause of death. Though the plaintiff clearly alleges that the defendants' actions, or lack thereof, caused Ms. Carr's death, there is little, if any, evidence that the defendants knew or should have known Ms. Carr was suffering from a heart-related problem. The plaintiff alleges that the symptoms of cardiomyopathy include: "shortness of breath, irregular heartbeat, dizziness/lightheadedness/fainting, and chest pain." (Doc. 67, Complaint, ¶ 50). However, no medical expert testimony or medical treatise evidence is later

presented to support this statement. The defendants presented the ABI's report, which contains statements from Dr. Braxton Smith and Dr. Rashida Abbas, both physicians who had treated Ms. Carr in years prior to her death. (Ex. Q, ABI Report, p. 25-27). The plaintiff does not dispute this evidence or offer any testimony to suggest the contrary. Dr. Smith, who had treated Ms. Carr since the 1970s, had never diagnosed her with any heart related issues. Carr's most recent visit to his office was in January 2011 for migraine headaches. (Id. at 25). Dr. Abbas, a cardiologist, had treated Ms. Carr for chest pains in 2003, though all tests appeared normal. Abbas also treated Ms. Carr for a rapid heart rate in 2006. Though Ms. Carr's medical records indicate one follow-up visit was scheduled, there is no further evidence of any heart-related medical distress. (Id. at 27).

The plaintiff's complaint is replete with allegations regarding indifference to Ms. Carr's mental health problems. The plaintiff's response to the defendants' motions for summary judgment relies solely on the alleged indifference to mental issues rather than any heart-related claims. Even if the plaintiff could prove deliberate indifference to Ms. Carr's serious mental health needs, there is no evidence presented connecting Ms. Carr's mental issues to the cause of her death, cardiomyopathy. "Medical causation is a technical and specific issue that requires the specialized knowledge of an expert medical witness." *E.C. ex. rel. Crocker v. Child Development Schools, Inc.*, 2011 WL 4501560, *9 (M.D. Ala. 2011) (quoting *Gillia*m, 667 F. Supp. 2d at 1299; *Wingster v. Head,* 318 F. Appx. 809, 815-816 (11th Cir. 2009)). The plaintiff has not offered any expert medical testimony to support causation.[4]

The plaintiff has alleged a state law wrongful death claim against all defendants except Nurse Small. Under Alabama law, the Alabama Medical Liability Act of 1987 ("AMLA")

---

[4] In any event, the court concludes that there is no evidence of deliberate indifference.

applies for "any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." Ala. Code § 6-5-551 (1975). Because the AMLA governs the Medical defendants, but not the County defendants, the court will address the two sets of defendants separately.

### A. Wrongful Death Against the Medical Defendants

Section 6–5–548(a) of the AMLA provides:

> In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.

In most cases, a plaintiff must present expert testimony to meet this burden. *Sorrell v. King*, 946 So. 2d 854, 861 (Ala. 2006). However, the Alabama Supreme Court recognizes an exception to this rule "where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it." *Id* (quoting *Tuscaloosa Orthopedic Appliance Co. v. Wyatt*, 460 So. 2d 156, 161 (Ala. 1984)).

This exception does not apply to the case at hand. A layperson is highly unlikely to understand the possible causes and symptoms of cardiomyopathy. A medical expert is necessary to establish that death resulted from the actions of the Medical defendants. Since the deadline for expert testimony disclosures has passed without any indication from the plaintiff that a medical expert will be supplied, Medical defendants' Motion for Summary Judgment will be granted as to Count II.

### B. Wrongful Death Against the County Defendants

Though lack of causation also applies to the plaintiff's claim against the County

defendants, the County defendants have also claimed the protection of various immunities under state law.

### *1. Sheriff Walls*

Alabama law recognizes sheriffs to be "constitutionally established executive officers of the State of Alabama." *Ex parte Sumter County*, 953 So. 2d 1235, 1239 (Ala. 2006). Because of this status, they are provided with absolute immunity to state claims when "acting within the line and scope of their employment." *Id* (quoting *Ex parte Purvis*, 689 So. 2d 794, 795 (Ala. 1996)); *see also* Art. 1, § 14, Ala. Const. of 1901. No allegations have been made to suggest that Walls was acting outside of the scope of his duties as a sheriff. The County defendants' Motion for Summary Judgment will be granted for Count II as to Walls.

### *2. Warden Bankson and Officer Kirkland*

Bankson and Kirkland have claimed state-agent immunity, pursuant to the *Cranman* test. The Alabama Supreme Court uses a test first developed in *Ex parte Cranman,* through subsequently broadened, to determine if State employees are entitled to state-agent immunity:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
> (1) formulating plans, policies, or designs; or
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
> (a) making administrative adjudications;
> (b) allocating resources;
> (c) negotiating contracts;
> (d) hiring, firing, transferring, assigning, or supervising personnel; or
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or

> attempting to arrest persons, [or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975];
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
> > (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
> > (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte City of Montgomery,* 99 So. 3d 282, 292-293(quoting *Ex parte Cranman*, 792 So. 2d 392, 405) (Ala. 2000); *modified by Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006)).

To claim State-agent immunity, the state agents bear the initial burden "of demonstrating that [the plaintiff's] claims arise from a function that would entitle them to immunity." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). If they successfully demonstrate such, the burden ships to the plaintiff, who then must establish that the state agents "acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority." *Id* (citing *Ex parte Wood*, 852 So. 2d 705, 709 (Ala. 2002)). "A State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Id* (internal quotations omitted).

Bankson, as warden of the county jail, is responsible for "formulating plans, policies, or designs" within the jail, as well as, "allocating resources . . . negotiating contracts . . . hiring, firing, transferring, assigning, or supervising personnel." *Cranman*, 792 So. 2d at 405. As for Kirkland, the Alabama Supreme Court has clearly stated that "the confinement of prisoners" is

included in the Cranman categories. *Howard v. City of Atmore*, 887 So. 2d 201, 206 (Ala. 2003). Kirkland was "discharging duties imposed on a department or agency by statute, rule, or regulation" while he was booking Ms. Carr. The plaintiff has not made any allegation that Kirkland did not perform the booking process according to the rules and regulations governing such activity. Additionally, Alabama law recognizes that jail guards, wardens, and correction officers fall under the meaning of § 6-5-338(a) as law enforcement officers, thereby qualifying for the fourth *Cranman* category. *Ex parte Dixon*, 55 So. 3d 1171, 1177 (Ala. 2010) (finding that "overseeing the custody and punishment of law violators is as much a part of law enforcement as undertaking the detection and apprehension of such violators"). Both Bankson and Kirkland have properly established their burden under the *Cranman* test.

As the burden shifts, the plaintiff has failed to show any evidence of willful, malicious, or fraudulent conduct on the part of Bankson or Kirkland. The evidence is clear that Ms. Carr was provided with access to medical professionals. The plaintiff makes no allegations that either Bankson or Kirkland acted contrary the decisions made by the jail's medical staff. Officials and jail staff "are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." *Williams v. Limestone County, Ala.*, 198 Fed. Appx. 893, 897 (11th Cir. 2006).Thus, the plaintiff fails to meet his burden under *Cranman*. Bankson and Kirkland are entitled to State-agent immunity for the state-law claims against them.

The plaintiff's Count III is based on Ala. Code § 14-6-19, which imposes the duty to provide "necessary medicines and medical attention to [prisoners] who are sick or injured" upon the sheriff and jailers. As this claim is asserted under state law, Sheriff Walls is protected by absolute immunity under Art. 1, § 14 of the Alabama Constitution. *See Sumter County*, 953 So.

2d at 1239 (Ala. 2006). Summary judgment will be granted in favor of Walls for Count III.

Count III is also asserted against Bankson and Kirkland. The defendants have claimed State-agent immunity as to all state law claims. Again, the *Cranman* test is applicable here. Because Alabama law considers jail staff to be law enforcement officers within the meaning of § 6-5-338(a), the jail staff falls under the fourth *Cranman* category. *See Dixon*, 55 So. 3d at 1177.

The plaintiff now has the burden of providing evidence of willful, malicious, or fraudulent conduct. The plaintiff focuses most, if not all, of his claim on the lack of mental health treatment provided to Ms. Carr. Bankson, in his deposition, admits there is a psychiatric nurse that visits the jail approximately once per week. The plaintiff has not disputed evidence put forth by the defendants showing Ms. Carr's mental health was discussed over the phone with Dr. Kilpatrick, who prescribed medication for such conditions and altered the medications and dosage pursuant to continuing reports. While there might be a question whether the care provided by the medical staff was sufficient to meet her mental health needs, there is no connection drawn between the actions of the jail staff and Ms. Carr's death. There is no dispute that the jail staff provided Ms. Carr with daily access to medical professionals, administered the prescribed medications to her on a timely basis, kept her under observation as instructed, and provided immediate emergency medical service upon her collapse. Indeed, the Eleventh Circuit has supported the right of jail staff to rely upon the decisions of medical professionals and need not question the judgement of medical staff. *See Howell v. Evans*, 922 F. 2d 712, 723 (11th Cir. 1991); *Williams,* 198 F. Appx. at 897-898 (11th Cir. 2006).  The defendants' Motion for Summary Judgment will be granted as to Count III.

Count IV of the plaintiff's complaint is alleged against Sheriff Walls and Warden

Bankson as a § 1983 claim for failure to properly train and supervise. The plaintiff first claims that the defendants "trained, encouraged and allowed" the jail staff to disregard the rights of homosexual detainees, thus denying Ms. Carr her due process rights. The plaintiff also claims the defendants failed to supervise the contract medical staff to ensure that proper care was administered.

Normally, vicarious liability and *respondeat superior* claims cannot be alleged under § 1983. *See Hartley v. Parnell,* 193, F.3d 1263, 1269 (11th Cir. 1999). Supervisory liability may be applied if "the actions of the supervising official bear a causal relationship to the alleged constitutional deprivation." *Gary v. Modena*, 2006 WL 3741364, *4 (11th Cir. 2006) (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)). To establish a causal relationship, the plaintiff must show:

> (1) the supervisor had notice of a widespread history of abuse which he neglected to correct; (2) the supervisor implemented a custom or policy that resulted in deliberate indifference to constitutional rights; or (3) the facts support the 'inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinated would act unlawfully and failed to stop them from doing so.'

*Id* (quoting *Gonzalez*, 325 F.3d at 1234-1235) (other internal citations omitted).

The plaintiff attempts to claim a widespread history of abuse towards homosexual inmates, specifically citing a letter written by the Sheriff in 2005, notably not by Sheriff Walls. The plaintiff alludes to "past instances of discrimination and a culture of anti-homosexual sentiment" but provides no evidence other than news articles concerning a sheriff no longer in office. (Doc. 95, Ex. G, Carr Dep. 61:20-62:5). Evidence of a custom or policy of discrimination against homosexuals is also void from the record. The plaintiff cannot establish the required causal relationship for a supervisory liability claim to survive under § 1983. Summary judgment

will be granted in favor of the defendants for Count IV.

As with the wrongful death claims against the Medical defendants, the plaintiff's claim for medical malpractice is governed by the AMLA. The Alabama Supreme Court has specifically held that " [i]n a medical-malpractice action, the plaintiff ordinarily is required to present expert testimony as to the relevant standard of care." *Cobb v. Fisher*, 20 So.3d 1253, 1257 (Ala.2009) (quoting *Martin v. Dyas*, 896 So.2d 436, 441 (Ala.2004)). "A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff." *Id* (quoting *Sorrell v. King*, 946 So.2d 854, 862 (Ala.2006)). An exception to the expert testimony rule is "where want of skill or lack of care is so apparent as to be understood by a layman, and requires only common knowledge and experience to understand it." *Id* (citations and internal modifications omitted). Because a layperson is unlikely to understand what causes and results from cardiomyopathy, a medical expert is necessary to establish causation. While the plaintiff presents much evidence of highly visible mental problems that would be apparent to a layperson, drawing the connection between mental disorders and cardiomyopathy would require expert testimony. The Medical defendants' Motion for Summary Judgment will be granted as to Count V.

The plaintiff alleges that Jeffery Reasons, the CEO of SHP, was negligent in his supervision of SHP and its employees. Because SHP is a health care provider, this claim falls under the requirements of the AMLA. The AMLA places the burden of proof on the plaintiff to prove "by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line

of practice." Ala. Code § 6-5-548 (1975). The plaintiff has provided no such evidence and offered no such "similarly situated" provider to attest to the expected standard of care in supervising this type of medical program. The court finds the plaintiff has not met his burden for the purposes of surviving summary judgment on this claim. The defendants' Motion for Summary Judgment will be granted as to Count VI.

### Conclusion

The County defendants' motion for summary judgement will be granted as to all counts. The Medical defendants' motion for summary judgment will also be granted as to all counts. In addition to the specific discussions with regard to the various counts, the court generally concludes that there is no evidence to establish any reasonable inference of any wrongdoing by any defendant. There appears to be only an attempt to hold the defendants responsible simply because the prisoner died. All defendants who are eligible for qualified immunity are also entitled to qualified immunity under the facts of this case. As to the Medical defendants *compare Richardson v. McKnight*, 521 U.S. 399 (1997) with *Filarsky v. Delia*, ___ U.S. ___ (April 17, 2012).

This the 30th day of April, 2013.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**